AUSA Anne L. Yonover, (312) 886-2038

**FILED**
**10/23/2023**
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In the Matter of the Search of:

Case No. 23 CR 537

**Subject Phone 2**, a navy blue/black Apple iPhone, further described in Attachment A-2

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Mario Kloc, a Special Agent of the Drug Enforcement Administration, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

### See Attachment A-2

located in the Northern District of Illinois, there is now concealed:

### See Attachment B-2

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities, and contraband.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Narcotics |

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

*Mario Kloc*

_____
*Applicant's Signature*

MARIO KLOC, Special Agent
Drug Enforcement Administration
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: October 23, 2023

*Maria Valdez*

_____
*Judge's signature*

City and State: Chicago, Illinois

MARIA VALDEZ, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, MARIO KLOC, being duly sworn, state as follows:

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA"), and I have been employed with the DEA since approximately June 2022. My current responsibilities include the investigation of narcotics trafficking offenses.

2.      As part of my duties as a Special Agent with the DEA, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

3.       I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4.      This affidavit is made in support of an application for a warrant to search the following:

a.     a gray/silver Apple iPhone that NATHANIEL LEE BUTLER-LUDWIG ("BUTLER-LUDWIG") dropped on the ground when law enforcement officers approached him on October 10, 2023, described further in Attachment A-1 ("**Subject Phone 1**") for the purpose of locating and seizing the items described further in Attachment B-1;

b.     a dark navy blue/black Apple iPhone that BUTLER-LUDWIG dropped on the ground when law enforcement officers apprehended him on the evening of October 10, 2023, described further in Attachment A-2 ("**Subject Phone 2**") for the purpose of locating and seizing the items described further in Attachment B-2;

5.     As set forth below, there is probable cause to believe that **Subject Phone 1** and **Subject Phone 2** (collectively, the "**Subject Phones**") contain evidence instrumentalities, and contraband concerning narcotics offenses, in violation of Title 21, United States Code, Section 841(a)(1) (the "**Subject Offense**").

6.     This affidavit is based on, among other things: (a) my personal knowledge of the facts and circumstances of the investigation described below; (b) information provided by other law enforcement officers, including written and oral reports that I have received from other law enforcement officers; (c) information obtained from witnesses, including confidential sources working for the DEA or other law enforcement agencies; (d) consensually recorded communications; (e) the results of physical surveillance conducted by law enforcement; and (f) my training and experience and the training and experience of other law enforcement officers involved

in this investigation. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence, instrumentalities, and contraband of violations of Title 21, United States Code, Section 841(a)(1), are located within the **Subject Phones**.

## I.     FACTS ESTABLISHING PROBABLE CAUSE

### A.     Summary of facts establishing Probable Cause.

7.     On October 10, 2023, a confidential source[1] (CS) attempted to purchase 1 kilogram of MDMA from Willie B. Robinson III ("Robinson") at Robinson's home in Chicago. Based on physical surveillance and statements Robinson made to the CS over the phone while arranging the deal, law enforcement identified BUTLER-LUDWIG as the individual likely supplying Robinson with the MDMA to sell to the CS. Ultimately, Robinson cancelled the sale and shortly thereafter law enforcement observed BUTLER-LUDWIG leave Robinson's residence carrying a backpack. Law enforcement followed BUTLER-LUDWIG and later approached him while he waited

---

[1] The CS has no current charges pending. In April 2023 the CS was approached by law enforcement agents in connection with an ongoing DEA investigation, in which the CS was observed delivering approximately ½ kilogram of methamphetamine. The CS admitted his/her involvement in money laundering and drug trafficking activities, and voluntarily agreed to cooperate with law enforcement. No promises have been made to the CS regarding future criminal charges related to the CS's previous money laundering and drug trafficking activities. The CS has a criminal history that includes various drug convictions and one conviction for aggravated kidnapping and aggravated battery with a weapon. I deem the information provided by the CS as set forth in this affidavit to be reliable, as it is corroborated in significant respects by independent evidence, including physical surveillance, text message communications, and the October 10, 2023 seizure of MDMA from BUTLER-LUDWIG.

at a bus stop. Upon seeing law enforcement approach him, BUTLER-LUDWIG dropped the backpack he was carrying and **Subject Phone 1** to the ground and ran. Law enforcement pursued BUTLER-LUDWIG and he eventually dropped to the ground and law enforcement apprehended him. After BUTLER-LUDWIG was brought up to his feet, law enforcement recovered **Subject Phone 2** in the area of the sidewalk where he had gone to the ground. Law enforcement searched the backpack that BUTLER-LUDWIG dropped, and they recovered approximately 1 kilogram of MDMA, as well as several pieces of identification belonging to BUTLER-LUDWIG. During BUTLER-LUDWIG's arrest, **Subject Phone 2** received an incoming call from a contact listed under a known nickname that BUTLER-LUDWIG used for Robinson.

**B. The Confidential Source and Robinson Conduct a Sample Transaction on September 26, 2023.**

8.    Over the past few weeks, the CS informed law enforcement officers that a man that the CS referred to as Willie B. Robinson III was selling narcotics.

9.    The CS provided law enforcement with Robinson's phone number, (XXX) XXX-3249 ("Robinson Phone"). Law enforcement officers ran the phone number for Robinson through a public records database, which revealed that the phone is associated with Robinson. Thereafter, law enforcement issued an administrative subpoena to T-Mobile. The T-Mobile subpoena return listed Robinson as the subscriber and customer associated with phone number (XXX) XXX-3249.

10.    Law enforcement officers then sent an unmarked Illinois Secretary of State photograph of Robinson to the CS. The CS confirmed that the man in the

photograph was Robinson. The CS told law enforcement officers that Robinson lived in the top apartment of 2321 N. Kostner Ave, in Chicago, Illinois (the "Robinson Residence").

11.     On September 26, 2023, the CS conducted a transaction with Robinson to obtain a sample of Methylenedioxymethamphetamine ("MDMA"), a Schedule I Controlled Substance. Prior to this transaction, the CS and Robinson communicated on the social media platform Instagram, as well as by exchanging text messages and recorded phone calls, which were digitally saved. The text messages included discussions about the sale of MDMA, including the quality, quantity, and the price of the MDMA.

12.     For example, based on my review of the text messages between Robinson and the CS, on September 25, 2023, Robinson and the CS exchanged the following messages:[2]

a.      Robinson said, "Yoo." The CS responded, "What up gang." Robinson then stated, "Nm chillin my ppl [people] got hella [a lot of] molly [MDMA] rn [right now] 750-800 a zip [ounce] was seein if u knew n e one who might possibly

---

[2] This investigation included the use of consensually recorded phone calls and text messages. The summaries of recorded conversations in this affidavit do not include reference to all the topics covered during the conversations. Further, quoted material from the recorded conversations as set out in this affidavit is taken from draft summaries, not final transcripts. The summaries do not include references to all statements made by the speakers on the topics that are described by the speakers. At various points in the Affidavit, I have indicated (sometimes in brackets) my interpretation of words and phrases used in the recorded conversations. My interpretations are based on information received from the CS, the contents and context of the recorded conversations, events that took place before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

want some." Based on my training and experience, I understand this message from Robinson to mean that he knew someone who had MDMA and that he was looking to sell the MDMA for $750 to $800 an ounce.

b. The CS stated, "I can ask bro. what color? It's clean or it has any meth to it? Some of my people been asking for that lately. The meth." Based on my training and experience, I understand the CS to have been asking Robinson whether the MDMA had any methamphetamine in it. Methamphetamine is a Schedule II Substance.

c. In response Robinson stated, "lol idk bout that all mdma has meth in it tho because that's what the ma stands for they take sass n ad meth to make it mdma but naah this is a1 quality whiteish grey." Based on my training and experience, as well as my conversations with the CS, I understood Robinson to explain that the MDMA that Robinson had access to may contain methamphetamine, and he was explaining to the CS what MDMA is.

d. Robinson then sent the CS a video recording of the MDMA in his possession. Based on my review of the video, it contained what appeared to be a large, crystal rock.

e. After receiving this video, the CS asked Robinson if Robinson would provide the CS with a deal if the CS purchased a larger amount of MDMA. Robinson responded, "I mean 8 is already cheap how much u thinkin I can give u a bird for 12; or a half for 7; or a 9 for 4." Based on my training and experience and conversations with the CS, I understand this to mean that Robinson was willing to

sell the CS a kilogram of MDMA for $12,000 (a bird references a kilogram), or half a kilogram for $7,000, or 9 ounces for $4,000.

13.     On September 26, 2023, at the direction of law enforcement, the CS met with Robinson at Robinson's residence (the "Robinson Residence") and obtained approximately 3.5 grams of MDMA. Following the transaction, the CS provided law enforcement officers with the sample the CS received from Robinson. Law enforcement officers field tested the 3.5 grams, which tested positive for MDMA. According to lab results, the sample the CS received from Robinson came back positive for Methylenedioxymethamphetamine. Law enforcement conducted a search of the CS and found no additional contraband.

### C.     The CS and Robinson Set Up a Time for the CS to Purchase 1 Kilogram of MDMA.

14.     Based on my review of the text messages and consensually recorded calls between the CS and Robinson, between the dates of October 2, 2023 and October 9, 2023, the CS and Robinson arranged for the sale of a kilogram of MDMA for $13,000. Specifically, the CS and Robinson discussed the price of the MDMA and the date for the transaction.

15.     Based on my review of text messages and consensually recorded calls between the CS and Robinson, on October 7, 2023, Robinson told the CS that they would have to meet with a courier to receive the kilogram of MDMA in Chicago. The CS and Robinson agreed to meet on the evening of October 10, 2023, to conduct the sale of 1 kilogram of MDMA.

**D.** **The CS Attempts to Purchase 1 Kilogram of MDMA from Robinson on October 10, 2023.**

16.     Based on my review of text messages and consensually recorded calls between the CS and Robinson, on October 10, 2023, Robinson told the CS that a courier, who was unknown at the time, would be delivering the kilogram of MDMA to Robinson's house. Robinson told the CS that the courier would be at his house at approximately 7:35 p.m.

17.     Based on my review of text messages and consensually recorded calls between the CS and Robinson, on October 10, 2023, at approximately 7:38 p.m., Robinson sent a text message to the CS stating, "6 min." The CS responded, "Cool. I am at Taconazo." Based on my understanding of the investigation, and my conversations with the CS, I understand these messages to mean that Robinson was waiting for the courier to arrive and that the courier was 6 minutes away.

18.     On October 10, 2023, at approximately 7:42 p.m., law enforcement observed Robinson on the front porch of the Robinson Residence and they observed Robinson on his cell phone.

19.     While law enforcement officers observed Robinson on the front porch, at approximately 7:43 p.m., law enforcement officers observed an unknown white male walk towards Robinson's apartment building. This unknown white male was later identified as NATHANIEL LEE BUTLER-LUDWIG.[3] Law enforcement officers observed BUTLER-LUDWIG exit a suspected rideshare and approach the Robinson

_____

[3] As explained below, later the same evening, law enforcement arrested BUTLER-LUDWIG and recovered photographic identification from him.

Residence. Law enforcement officers then observed BUTLER-LUDWIG enter the building where the Robinson Residence is located. Law enforcement officers saw BUTLER-LUDWIG wearing black pants, a black jacket, a black hat, a black backpack, and glasses.

20.     Shortly after BUTLER-LUDWIG entered the building where the Robinson Residence is located, Robinson sent the CS the following text messages:

      a.     "My boy said he can hop on a video call n show him it's here[;]"

      b.     "But He Dnt wanna go outside n make the move y'all can come inside my boy is a white boy[;]"

      c.     "He's not on no weird shit it's jus not his so he Dnt wanna take no risk[;]" and

      d.     "But if it's a issue then f*** it I guess it's just a bust."

21.     Based on my review of several text messages and phone calls between the CS and Robinson on October 10, 2023, they could not come to an agreement on where they would meet to conduct the transaction.

22.     At approximately 8:42 p.m., Robinson called the CS and said, "Ya talk to my homie." Another individual then got on the phone, and said, "Yo, what up brother? This is T.Z.'s homie. Like I don't understand. I brought this shit all the way over here. Why don't you guys just want to come up here, look at it, check it out, I can count the money, we're all adults, so there's no like shady shit going on in a car and we're not putting ourselves in danger." The CS responded that his "guy" was not going to come up there, but they could meet at the Taconazo or something. The other

individual on the phone then stated, "Alright. Sure, sure. Never mind, bro thanks for wasting my time, I appreciate it."

23.     Law enforcement officers continued to conduct surveillance on the Robinson Residence. At approximately 8:11 p.m., law enforcement officers observed Robinson exit his building empty handed and walk towards the area where he had previously agreed to meet the CS. Law enforcement did not see BUTLER-LUDWIG exit the building during this time.

24.     At approximately 8:47 p.m., law enforcement officers observed BUTLER-LUDWIG exit the front of the building where the Robinson Residence is located. When BUTLER-LUDWIG exited the Robinson Residence, law enforcement officers observed him with the same black backpack that he had earlier when he arrived at the Robinson Residence. Law enforcement officers saw BUTLER-LUDWIG get into what they believed to be a rideshare vehicle and then leave the area.

25.     Law enforcement officers followed the car that BUTLER-LUDWIG had gotten into to the area of Fullerton Avenue and Western Avenue in Chicago, Illinois. While the car was stopped at a red traffic light, law enforcement observed BUTLER-LUDWIG exit the car and walk towards a bus stop near Fullerton Avenue and Western Avenue.

26.     At approximately 8:59 p.m., law enforcement officers approached BUTLER-LUDWIG at Fullerton Avenue and Western Avenue. The law enforcement officers were wearing fully identifiable police vests and attempted to engage in a consensual encounter with BUTLER-LUDWIG. As they approached BUTLER-

LUDWIG, he discarded his black backpack and cell phone, by removing the backpack from his back and dropping it to the ground and dropping the cell phone to the ground. The cell phone that was recovered near the backpack is **Subject Phone 1**.

27.     BUTLER-LUDWIG continued to run from the law enforcement officers. The law enforcement officers identified themselves and asked BUTLER-LUDWIG to stop, but BUTLER-LUDWIG continued to run. Law enforcement officers pursued BUTLER-LUDWIG on foot, and eventually BUTLER-LUDWIG went to the ground and laid down. Shortly thereafter, law enforcement apprehended BUTLER-LUDWIG. Law enforcement officers located a second cellphone (**Subject Phone 2**) on the ground where BUTLER-LUDWIG was laying when he was detained by law enforcement.[4]

### E.     Law Enforcement Officers Arrest NATHANIEL LEE BUTLER-LUDWIG.

28.     After law enforcement officers caught BUTLER-LUDWIG, they detained him and escorted him towards the vicinity of where he abandoned his black backpack and **Subject Phone 1**. BUTLER-LUDWIG informed the law enforcement officers that he did not want to talk. The law enforcement officers did not locate any identification on BUTLER-LUDWIG's person. The law enforcement officers asked BUTLER-LUDWIG if his wallet would be in the black backpack, to which BUTLER-LUDWIG indicated he did not know.

---

[4] In a prior affidavit submitted in support of a criminal complaint in case number 23 CR 537, I incorrectly stated that following the arrest of BUTLER-LUDWIG a further search of BUTLER-LUDWIG yielded a second cell phone on his person.

29.    The law enforcement officers utilized a K9 to perform an air sniff of the area from which BUTLER-LUDWIG fled. The K9 alerted to the odor of narcotics within the black backpack that BUTLER-LUDWIG had dropped on the ground. Based on law enforcement officers' observations, they believed that BUTLER-LUDWIG traveled from the Robinson Residence with the kilogram of MDMA that he intended to deliver to Robinson in order to complete the sale to the CS. Based on the law enforcement officers' observations, and on their training and experience, they believed that because the transaction with the CS did not occur, BUTLER-LUDWIG left the Robinson's Residence with the kilogram of MDMA.

30.    Law enforcement officers searched the black backpack that BUTLER-LUDWIG had dropped on the ground before he ran from the law enforcement officers and they located approximately one kilogram of brown/gray crystal-like substance that was consistent with the appearance of MDMA secured in a clear sandwich bag, which contained two clear plastic vacuum sealed bags. The vacuum sealed bags were inside a United States Postal Service Priority Mail package. The United States Postal Service package was inside a plastic bag, which was inside of the black backpack. The substance inside the vacuum sealed bags appeared to be a brown/gray crystalized substance. Additionally, an unknown amount of U.S. Currency was found in the black backpack.

31.    Law enforcement officers also located a key fob on a key chain with other keys in BUTLER-LUDWIG's backpack. Law enforcement officers believe that the key fob and keys are related to a prior statement that Robinson had made to the CS that

referenced Robinson's source of supply coming from New York with a key fob to access the bulk amount of MDMA stored in Chicago, Illinois.

32.     Additionally, inside the backpack, law enforcement found a black rain jacket. Law enforcement found a wallet inside the front breast pocket of the black rain jacket.  Law enforcement officers found five cards inside the wallet, including an Illinois Identification Card with the name Nathaniel Lee Butler-Ludwig, with a date of birth of XX/XX/1993, a Blue Cross and Blue Shield insurance card issued to Nathaniel Butler-Ludwig, a Chase debit visa card issued to Nathaniel L. Butler-Ludwig, a Chase Freedom visa card issued to Nathaniel Butler Ludwig, and a Vanilla Visa Gift Card.

33.     In addition to recovering the backpack, law enforcement recovered **Subject Phone 1**, which BUTLER-LUDWIG dropped to the ground as he was fleeing from law enforcement on October 10, 2023. Law enforcement located **Subject Phone 1** near the black backpack.

34.     Law enforcement located a second cellphone, **Subject Phone 2**, on the ground where BUTLER-LUDWIG was laying when he was detained by law enforcement. Later, law enforcement observed an incoming call on **Subject Phone 2** from "Teezee Newest New." I believe that Robinson is the person that was calling **Subject Phone 2** and identified as Teezee Newest New because based on my review of Robinson's Facebook, one of his account name's is "T.Z." and the other is "Ben Savage (T.Z. Duhh)." Further, during one of the recorded calls between the CS and

Robinson, when Robinson told the CS to talk to his friend, the person who got on the phone said, "Yo, what up brother? This is T.Z.'s homie."

35.     During a post-arrest interview, BUTLER-LUDWIG invoked his Miranda rights.

36.     The brown/gray crystalized substance that was recovered from inside the black backpack field tested positive for MDMA.

37.     Since October 10, 2023, the **Subject Phones** have been in law enforcement's custody.

38.     At the time of arrest, law enforcement believed that there was data stored on the **Subject Phones**, including text messages and voice messages, sent and received by BUTLER-LUDWIG, during the course of the commission of the narcotics offense described above.

39.     On or about October 11, 2023, BUTLER-LUDWIG was charged by criminal complaint with knowingly and intentionally possessing with intent to distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of Methylenedioxymethamphetamine, a Schedule I Controlled Substance.

40.     Based upon my training and experience, I know that cellular phones may contain relevant evidence of narcotics offenses, including text messages made or received from the **Subject Phones** that are located in the memory of the **Subject Phones**, which messages may provide information regarding the identities of, and the methods and means of operation and communication used by, the participants in

the narcotics offenses. Moreover, digital photographs located in the memory of the **Subject Phones** may contain images of the tools or participants involved in the narcotics offenses. Additionally, digital photographs stored in the **Subject Phones** may contain images of the user of the **Subject Phones**, the user's associates (including persons involved in or knowledgeable about the subject offense), places frequented by the user of the phone leading up to and during the subject offense, and locations and instrumentalities used in committing the subject offense.

41. In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Furthermore, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

42.     Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

43.     Through experience as a law enforcement officer and through the experience of other law enforcement officers as conveyed to me, I have learned that individuals involved in criminal offenses, including possession with intent to distribute narcotics, commonly use cellular telephones as a means to communicate. Individuals involved in criminal offenses, including possession with intent to distribute narcotics, also often store telephone numbers and names or nicknames of fellow conspirators or individuals involved in the illegal conduct on their telephones and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones. Because, as explained above, the **Subject Phones** were

the only cellular phones that defendant abandoned immediately following an attempted narcotics transaction with the CS, and because, in my experience and in the experience of other agents, defendants use telephones to contact co-conspirators or other individuals involved in the illegal conduct, there is probable cause to believe the **Subject Phones**, described further in Attachments A-1 and A-2, contain evidence of narcotics violations.

## II.   BIOMETRIC ACCESS TO THE SUBJECT PHONES

44.   Based on my review of the **Subject Phones**, they are Apple iPhones and based on my training and experience, I believe that they are equipped with a facial recognition feature. This warrant, therefore, requests the authority to permit law enforcement to obtain from BUTLER-LUDWIG, the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a.   I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.      If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

c.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

d.      The passcode or password that would unlock the **Subject Phones** subject to search under this warrant are not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the **Subject Phones**, making the use of biometric features necessary to the execution of the search authorized by this warrant.

e. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

45. Due to the foregoing, if law enforcement personnel determines that the **Subject Phones** may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of BUTLER-LUDWIG, to the fingerprint scanner of the **Subject Phones**; and (2) hold the **Subject Phones** in front of the face of BUTLER-LUDWIG and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

46. BUTLER-LUDWIG was arrested on October 10, 2023, and charged with possession with intent to distribute MDMA on October 11, 2023. BUTLER-LUDWIG is currently represented. Accordingly, if this warrant is issued, law enforcement will work with BUTLER-LUDWIG's attorneys for purposes of obtaining the biometric features and data necessary to attempt to unlock the **Subject Phones**.

## III. SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

47. Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased,

compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

48.     In order to fully retrieve data from a computer system or cellular device, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

49.     In addition, electronic storage media such as a computer or cellular device, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## IV.     PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

50.     The government's review of electronic storage media, including cell phones, shall be conducted pursuant to the following protocol.

51.     The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachments B-1 and B-2.

52.     The review of electronically stored information and electronic storage media described in Attachments A-1 and A-2 may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachments B-1 and B-2:

a.      examination of the categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachments B-1 and B-2;

b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachments B-1 and B-2;

c.      surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachments B-1 and B-2;

d.      opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachments B-1 and B-2; and

e.      using forensic tools to locate data falling within the list of items to be seized as set forth in Attachments B-1 and B-2.

53.     Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachments B-1 and B-2.  To the extent that evidence of

crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other items that are not within the scope of the warrant. However, the government may continue its search of that same data or other items if it also contains evidence of crimes within the scope of this warrant.

## V.    CONCLUSION

54.    Based on the foregoing, I respectfully submit that there is probable cause to believe that, drug trafficking offenses, in violation of Title 21, United States Code, Section 841(a)(1) have been committed, and that evidence, instrumentalities and contraband relating to this criminal conduct, as further described in Attachments B-1 and B-2 will be found in the **Subject Phones**, more particularly described in Attachments A-1 and A-2. I therefore respectfully request that this Court issue a search warrant for the **Subject Phones**, more particularly described in Attachments A-1 and A-2, authorizing the seizure of the items described in Attachments B-1 and

B-2, pursuant to the protocol described in the addendum to Attachment B-1 and Attachment B-2.

FURTHER AFFIANT SAYETH NOT.

_Mario Kloc_
_____
MARIO KLOC
Special Agent,
Drug Enforcement Administration


SWORN TO AND AFFIRMED by telephone on October 23, 2023.

_____
Honorable MARIA VALDEZ
United States Magistrate Judge

# ATTACHMENT A-2

## DESCRIPTION OF ITEM TO BE SEARCHED

A dark navy blue/black Apple iPhone that BUTLER-LUDWIG dropped on the ground when law enforcement officers apprehended him on the evening of October 10, 2023, as depicted in the photo below:

 

## ATTACHMENT B-2

## LIST OF ITEMS TO BE SEIZED

Evidence, instrumentalities, and contraband concerning violations of Title 21, United States Code, Sections 841(a)(1) (the "**Subject Offense**"), as follows:

1. All records of telephone calls, text messages, voice messages, SMS messages, picture messages, voicemails stored within the device, contact lists and phonebook, recent call activity, electronically formatted personal notes, photographic or video images, audio recordings, application data, browser history data, or records of appointments and/or reminders annotated on a calendar relating to the possession, receipt, sale, or distribution of MDMA or other illegal narcotics, Willie B. Robinson III, or reflecting the identity of the user of **Subject Phone 2**.

2. Data, records, or information relating to NATHANIEL LEE BUTLER-LUDWIG's contacts or communications with co-conspirators engaged in the **Subject Offense**, including contacts or communication with Willie B. Robinson III.

3. Records, documents, programs, applications or materials relating to the trafficking of controlled substances, including ledgers, pay-owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, or times when controlled substances were bought, sold, or otherwise distributed;

4. Records, documents, programs, applications or materials relating to the possession of firearms during, in relation to, or in furtherance of the trafficking of controlled substances;

5. Records, documents, programs, applications, or materials showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances;

6. Records, items, and documents reflecting travel for participating in the trafficking of controlled substances, including Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

7. Audio recordings, pictures, video recordings, or still-captured images relating to the possession or distribution of controlled substances and the collection, transfer or laundering of the proceeds of the above-described offenses; and

8. Indicia of control, possession, or ownership of **Subject Phone 2** described in this warrant, such as telephone bills, payment receipts, photographs, and bank or financial records.

Law enforcement personnel are authorized to: (1) press or swipe the fingers (including thumbs) of BUTLER-LUDWIG, to the fingerprint scanner of **Subject Phone 2**; and (2) hold **Subject Phone 2** in front of the face of BUTLER-LUDWIG and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## ADDENDUM TO ATTACHMENT B-2

The government's review of electronic storage media, including cell phones, already in its possession shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B-2.

The review of electronically stored information and electronic storage media described in Attachment A-2 may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B-2:

a.  examination of the categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B-2;

b.  searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B-2;

c.  surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B-2;

d.  opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B-2; and

e.  using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B-2.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment B-2. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other items

that are not within the scope of the warrant. However, the government may continue its search of that same data or other items if it also contains evidence of crimes within the scope of this warrant.